**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**MICHAEL JONES, 90-A-5292,**

                              **Plaintiff,**                    **02-CV-0055(Sr)**

**v.**

**L.T. BRECKON, et al.,**

                              **Defendants.**

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment.  Dkt. #18.

Currently before the Court is defendants' motion (Dkt. #46), for summary judgment and plaintiff's motion (Dkt. #59), for sanctions and payment of expenses.  For the following reasons, Lt. Breckon's motion for summary judgment is granted; C.O. Smalok's motion for summary judgment is denied; C.O. Magyar's motion for summary judgment is denied and plaintiff's motion for sanctions is denied, but his request for payment of expenses is granted.

## BACKGROUND

Plaintiff, an inmate of the New York State Department of Corrections ("DOCS"), since 1990, was transferred from the Greenhaven Correctional Facility to the

Attica Correctional Factility ("Attica"), on November 12, 1999.  Dkt. #28, ¶ ¶ 7-8.  On

December 3, 1999, two bags of plaintiff's personal property arrived at Attica and were

inspected by Corrections Officer ("C.O."), Foley, who observed a document entitled

"William Lynch Lectures – How to Keep a Black Man Down from One White Slave

Owner to Another" and imprinted with the following attribution:

> "Willie Lynch Lectures" Copyright 1997 the AFC ©
> No copies or reproductions may be produced, distributed
> or generated without the transcribers [sic] written permission.
> For reproduction details contact the AFC research dept.

Dkt. #49, Exh. A.  On December 22, 1999, C.O. Foley issued an inmate misbehavior

report charging plaintiff with violating Rule 105.12, which provides that

> An inmate shall not . . . possess . . . unauthorized
> organizational insignia or materials.  An unauthorized
> organization is any gang or any organization which has not
> been approved by the deputy commissioner for program
> services.

7 N.Y.C.R.R. § 270.2.  The misbehavior report provides that plaintiff's property

contained

> a copy of the William Lynch document with a copyright
> stamp of the AFC on the bottom right hand corner of the last
> page.  The AFC (Amfrican Freedom Communion) is an
> unauthorized group in this department.  This report was
> written after further investigation, keeplocking him at this
> time.

Dkt. #49, Exh. A.  Plaintiff was placed in keeplock and served with a copy of the

misbehavior report at 10:45 a.m. on December 24, 1999.  Dkt. #28, ¶ 22; Dkt. #49,

Exh. A.

On December 23, 1999, plaintiff alleges that he asked C.O. Smalok if he could attend recreation, but was told "that inmates don't get keeplock recreation while in D-Block." Dkt. #28, ¶ 22.  On December 24, 1999, plaintiff alleges that he showed C.O. Smalok the portion of the Attica Inmate Orientation Guideline Manual which "specifically requires that all inmate[s] in Attic[a] receive one hour of recreation outside of their cell per day," but C.O. Smalok walked away without responding.  Dkt. #28, ¶ 23.  Plaintiff's request for recreation was also denied by C.O. Magyar.  Dkt. #28, ¶ 24.

Lieutenant Thomas Breckon, the Superintendent's designee, conducted the inmate disciplinary hearing between December 28, 1999 and January 4, 2000.  Dkt. #49, ¶¶ 2, 6.  During the course of the hearing, plaintiff objected that the confiscated document did not indicate its origin and that the initials AFC could stand for an authorized organization.  Dkt. #49, Exh. B, p.9.  Plaintiff also requested a list of unauthorized organizations, but was informed by Lt. Breckon that unless the Deputy Commissioner of Program Services authorizes a group to operate within a facility, it is an unauthorized group.  Dkt. #49, Exh. B., p.10.  Lt. Breckon noted that although the particular document obtained from plaintiff did not spell out "Amfrican Freedom Communion," the document had been commonly associated with that group.  Dkt. #49, Exh. B, p.10.  Plaintiff then complained that Lt. Breckon was not being fair and impartial, because he had obviously predetermined that the document was affiliated with an unauthorized organization.  Dkt. #49, Exh. B, p.10.

Plaintiff proffered that the document in his possession was delivered to him at Greenhaven by mail after he requested it from the Library of Congress six years ago.  Dkt. #49, Exh. B, p.11.  Plaintiff explained that he requested the document after reviewing it during the course of a black studies class taught by an inmate at Greenahven and questioned how he could be disciplined for possessing information disseminated through the Black Studies Group at Greenhaven.  Dkt. #49, Exh. B, pp.19 & 28.  Lt. Breckon informed plaintiff that "just because something is handed out through a class that's run by inmates doesn't mean that it's legal for them to hand it out."  Dkt. #49, Exh. B, p.28.

When Lt. Breckon pointed out that the document contained a 1997 copyright, plaintiff stated that he had written his family and they had responded that the copyright belonged to Soft Line Information Incorporation.  Dkt. #49, Exh. B, p.29.  Lt. Breckon questioned how plaintiff could have written his family and received a response within one week, including Christmas holidays.  Dkt. #49, Exh. B, pp.11-12.  In any event, Lt. Breckon noted that plaintiff's copy of the document was stamped with a copyright from AFC  Dkt. #49, Exh. B, p.14.

Plaintiff complained that he should not be punished for possession of a document that had gone through mail review at Greenhaven.  Dkt. #49, Exh. B, p.12.  Plaintiff also complained that officials at Greenhaven had conducted several thorough searches of his cell, including his documents, and had not confiscated this document as contraband.  Dkt. #49, Exh. B, p.21.

Lt. Breckon noted that he was in the process of "doing quite a number of hearings on this same paperwork that has been confiscated from various inmates throughout the facility" and presented plaintiff with a copy of the same speech, which had been taken from another inmate, which indicates that it was

> produced by the Amfrican Freedom Communion, and then it has in brackets A.F.C., published by Amfrican America's Freedom Party.  Distributed by the Freedom School of Liberation Studies.

Dkt. #49, Exh. B, p.16.  Plaintiff objected that this document was "outside the record" and complained that Lt. Breckon should not be basing his decision upon a document found in someone else's possession.  Dkt. #49, Exh. B, pp.16-17.

C.O. Foley testified that DOCS had no quarrel with the text of the document confiscated, but was only concerned with the fact that it was distributed by the AFC, which

> stands for the Amfrican Freedom Communion, which is an Unauthorized Group in this state, and it was formed by an inmate here at Attica, and . . . that's why it's illegal.

Dkt. #49, Exh. B, pp.21-22.  Plaintiff asked for information about the background and nature of the AFC, but his request was denied.  Dkt. #49, Exh. B, p.25.  C.O. Foley confirmed that this document would not have been permitted at Greenhaven either.  Dkt. #49, Exh. B, p.22.

When questioned about the delay between the search of his possessions on December 3rd and the issuance of the misbehavior report on December 22nd, C.O.

Foley responded that there were "numerous other . . . materials to go over."  Dkt. #49,

Exh. B, p.22.  Lt. Breckon further explained that

> There has been quite a bit of property that's coming in here
> from other inmates.  There has been a lot going on . . . with
> the talk statewide of an inmate strike and what have you.
> There has been a lot of property searched.  I believe . . . the
> report was written as soon as it could practically be written.

Dkt. #49, Exh. B, p.27.  In support of his motion for summary judgment, Lt. Breckon

declares that

> At the time of the events alleged in the complaint, there was
> a concern throughout DOCS of a planned prison strike to
> occur on January 1, 2000.  Due to the efforts of DOCS, the
> planned prison uprising did not occur.

Dkt. #49, ¶ 11.  Lt. Breckon declares that the AFC "was believed to be behind the

planned prison strike."  Dkt. #49, ¶ 12.


Lt. Breckon found plaintiff guilty of the charge and sentenced him to 30

days keeplock and 30 days loss of phone, package and commissary privileges.  Dkt.

#49, Exh. B, p.29.  In reaching this determination, Lt. Breckon relied upon

> the written report of Officer Foley which states that he
> recovered paperwork from your property that was
> copyrighted by the A.F.C., which stands for Amfrican
> Freedom Communion.  This organization is not authorized
> by the Department of Corrections.  You admitted that these
> papers were yours, but claim that you received them six
> years ago.  The copyright on the paper is 1997 however.
> You also claimed to have written your family and received a
> response from them about how this paperwork was actually
> copyrighted by someone else.  I find this to be impossible
> due to the fact that you received the Misbehavior Report
> December 24th.  The Post Office was closed the 25th and the
> 26th.  Your mail would not have even left the institution until
> the 27th, and I started the hearing on the 28th. . . .  You also

> gave conflicting testimony about how you received this material, either through the mail four years before it was copyrighted or through a Black Studies Group.  All of this conflicting and improbable testimony leads me to believe that you knew you weren't allowed to have the material, and you are now trying to cover that fact up.

Dkt. #49, Exh. B, pp.29-30.  Plaintiff's appeal of the disposition was affirmed on February 8, 2000.  Dkt. #49, Exh. A.

Plaintiff alleges that he was denied recreation during the entire duration of his keeplock confinement.  Dkt. #28, ¶ 27.  Plaintiff alleges that he was also denied recreation while in keeplock from February 23, 2000 until March 2, 2000.  Dkt. #28, ¶ 28.  On December 30, 1999 and January 5, 2000, plaintiff alleges that C.O. Smalok and C.O. Magyar did not allow him to attend a medical callout to seek care for back pains and breathing difficulties allegedly caused by the lack of recreation.  Dkt. #28, ¶¶ 28-29; Dkt. #55, Exh. E & G.

Plaintiff alleges that he submitted a grievance on January 5, 2000 regarding the lack of recreation and denial of medical callouts, but received no response, causing him to submit a "complaint/appeal" to Thomas Eagan, Director of the Inmate Grievance Program ("IGP").  Dkt. #28, ¶¶ 30-31; Dkt. #55, Exh. I & J.   By letter dated February 16, 2000, Director Eagan advised plaintiff that "[c]ontact with the facility administration reveals that you have not filed a grievance with the facility IGRC" and directed him to comply with the Inmate Grievance policy.  Dkt. #55, Exh. K.

On March 6, 2000, plaintiff submitted a grievance stating:

> On January 5, 2000 I submitted the included grievance concerning inmates not being allowed to go to rec while on keeplock. I sent in the enclosed grievance and never got a response. I also sent it to Albany but they sent it back with instruction [sic] to refile it. I was keeplock again from Feb. 23, 2000 until March 2, 2000 and was again denied keeplock rec.

Dkt. #55, Exh. L. This grievance was numbered 40480-00. Dkt. #55, Exh. L.

While waiting a response, plaintiff complained to Richard Savage, Deputy Superintendent for Programs at Attica, who returned his grievances with instructions to follow standard procedure. Dkt. #55, Exh. M – Q. Plaintiff also wrote a letter to Commissioner Goord complaining that Attica was not complying with the grievance procedure. Dkt. #55, Exh. R. On March 24, 2000, plaintiff received the following response:

> All inmates who are keeplocked are entitled to one hour of recreation each day[,] if requested. However, based on security conditions the time of recreation and the number of inmate[s] participating at any one time may be limited.

Dkt. #55, Exh. L.

On March 28, 2000, plaintiff wrote Superintendent Herbert to appeal

> two grievances filed January 5, 2000, and March 6, 2000. I am appealing the decision because my . . . problem concerning . . . my medical call outs were never answered.
>
> Also the reason that was stated "security" can not justify being denied keeplock rec. because the[re] are always eight or nine officers sitting around doing nothing all day long in the D-block corridor, any one of these officers can take care of the keeplock rec. situation.

> Finally, they can rotate the keeplock rec. time so that all
> inmates can get rec. because D-block do not have rec. in
> the afternoon.

Dkt. #55, Exh. S.

On April 16, 2000, the Superintendent accepted grievance number A-

40480-00, stating:

> If you are keeplocked, you are entitled to daily keeplock rec.
> This is run in the morning in your block.  However, you are
> not currently in keeplock status and not affected by the issue
> at this time.

Dkt. #55, Exh. T.  On April 10, 2000, plaintiff appealed the greivance determination,

stating:

> The issue was never answered as to why I was denied my
> Medical call-outs on two occasions.  On December 30, 1999,
> and on January 5, 2000.

Dkt. #55, Exh. U.

On May 3, 2001, plaintiff sent a letter to Director Eagan advising that he

placed his appeal to the April 7, 2000 determination in the facility mailbox addressed to

the grievance officer, but had not received any response.  Dkt. #55, Exh. W.  On May

15, 2000, plaintiff received correspondence from Director Eagan stating:

> Commissioner Goord [h]as asked me to respond to your
> letter to him regarding you allegations that your grievances
> are being ignored.
>
> Contact with the facility administration reveals that you are
> not mailing your grievances to the attention of the Inmate
> Grievance Resolution Committee (IGRC).

> Please be advised that grievances and grievance appeals should be submitted to the facility IGRC to insure proper processing and review.

Dkt. #55, Exh. V.

By letter dated May 17, 2001, Director Eagan acknowledged receipt of plaintiff's letter of May 3, 2001 and responded as follows:

> Contact with facility administration reveals that grievance #A-40480-00, regarding keeplock recreation, was filed on May 9, 2000, heard by the Inmate Grievance Resolution Committee (IGRC) on March 24, 2000 and answered by the Superintendent on April 6, 2000.  No appeal was received and your grievance was closed.

Dkt. #55, Exh. X.

By letter dated May 22, 2001, plaintiff advised Director Eagan as follows:

> First and foremost[,] on January 24, 2000, I sent you a complaint alon[g] with my first grievance I filed on January 5, 2000, complaining about the following: 1)., [sic] Denial of keeplock recreation, 2)., [sic] No light's [sic] in my cell, 3)., [sic] Denial of medical callout's [sic] on two occasions, and 4)., [sic] denial of religious showers.

> The reason why I sent you the complaint was because each time I forwarded my grievance through the normal facility channel's [sic] for some reason, it never reach[ed] it's destination or never got processed per Directive 4040.

> On February 16, 2000, you responded to my complaint and insisted that I use the normal channel's [sic] via mail or grievance box.

> I followed your advice and refile[d] the grievance. After not receiving a response, I then file[d] a grievance against the facilities grievance department due to the lack of

a response to my January 5, 2000, complaint. I also forwarded a copy of both grievances to the Dept. of Programs and requested that he [sic] also file the two complaint's [sic] with the grievance department because they were not responding to my complaints.

On March 9, 2000, the Dept. of Programs return[ed] the two complaint's [sic] and suggested that I again follow the normal channels, via mail box.  On March 9, 2000, I responded to the Dept's reply and inform[ed] him [sic] that the reason why I sent the two complaint's [sic] to him [sic] was because I wasn't receiving any response via mail box and there was no grievance rep. in D-Block.

On March 15, 2000, the [D]ept. wrote me back and again stated that I follow the facilities channel's [sic] via mail box.  I also wrote to Comm. Goord expressing my complaint on March 9, 2000.  Only after I wrote to the Commissioner did one of my grievances get an answer.

On May 15, 2000, you responded to my complaint I sent to Comm. Goord.  In your response you stated as you now do again, that the facility never received my appeal.  I have complain[ed] some five (5), times about this facilities [sic] none [sic] response to my grievances.  In each response to my complaint's [sic] the grievance problems were never dealt with.

Secondly, I am very much aware of the provisions set forth in Directive 4040.  In fact if you would look at Directive 4040 – VI, (g), at page 9 under "Procedural Safeguards", [sic] it states in part: "matters not decided within the time limits may be appeal[ed] to the next step". [sic] According to the above provision I am required to appeal directly to you when ever [sic] my attempts at facility levels are futile.

Again, I respectfully request th[at] you decide the following issues that were not addressed by the Superintendent: 1)., [sic] whether i can be denied medical callout's due to keeplock status, and 2). [sic] whether I can be denied Religious showers due to keeplock status. Finally, I ask that no retaliation be commenced due to this appeal.

Dkt. #55, Exh. Y.  In response, by letter dated May 30, 2001, Director Eagan advised plaintiff to comply with the directives of the IGP.  Dkt. #55, Exh. Z.

Plaintiff's amended complaint, commenced pursuant to 42 U.S.C. § 1983, alleges that Lt. Breckon denied him a fair hearing when he denied (1) documentary evidence, including an investigative report, a copy of the policy governing incoming property, and the directive governing the conduct of the hearing; (2) documents, including the misbehavior report, from another disciplinary hearing involving a document indicating that AFC was the acronym for Amfrican Freedom Communion; (3) the name and all information relating to the inmate who had allegedly formed the Amfrican Freedom Communion; (4) his teacher as a witness to testify that the speech was permitted at Greenhaven; and (5) notice of the fact that the Amfrican Freedom Communion was not an authorized group.  Dkt. #28.  Plaintiff also complains that the misbehavior report was untimely and that Lt. Breckon was biased and improperly relied upon copies of the speech attributed to Amfrican Freedom Communion which were confiscated from other inmates.  Dkt. #28.  Plaintiff's amended complaint also alleges that C.O. Smalok and C.O. Magyar denied him recreation during his keeplock confinement.  Dkt. #28.[1]

---

[1] Although plaintiff's amended complaint also alleges that C.O. Smalok and C.O. Magyar denied plaintiff medical call outs, that claim was previously dismissed as insufficient to state a constitutional claim.  Dkt. #3.

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982.   A party seeking to defeat a motion for summary judgment

-13-

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


### Exhaustion of Administrative Remedies

Defendants allege that plaintiff failed to exhaust the grievance process with respect to his allegation that C.O. Smalok and C.O. Magyar denied him recreation while he was confined to keeplock.  Dkt. #47, p.6.  In support of this argument, Thomas Eagan, the Director of the IGP declares that the Central Office Review Committee ("CORC"), has no record of any appeal of a grievance by plaintiff regarding keeplock recreation.  Dkt. #48, ¶ 3.  In support of the motion for summary judgment, Director Eagan attaches a copy of his letter of May 17, 2001.  Dkt. #48, Exh. B.


The Prison Litigation Reform Act of 1995 ("PLRA") states:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  In *Porter v. Nussle*, 534 U.S. 516 (2002), the Supreme Court held that exhaustion of administrative remedies is mandatory[2] and should be applied broadly.  *Id.*

---

[2] Although mandatory, administrative exhaustion is an affirmative defense rather than a jurisdictional predicate.  *Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003); *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999).

at 524.  "Even when the prisoner seeks relief not available in grievance proceedings" –

such as monetary damages – "exhaustion is a prerequisite to suit."  *Id.* at 524, *citing*

*Booth v. Churner*, 532 U.S. 731, 741 (2001).  The *Nussle* Court reasoned that requiring

inmates to follow the grievance process would reduce the quantity and improve the

quality of prisoner suits; filter out frivolous claims; and for those cases that eventually

came to court, the administrative record could potentially clarify the legal issues.  *Id.* at

524-25.  Thus, the "PLRA's exhaustion requirement applies to all inmate suits about

prison life, whether they involve general circumstances or particular episodes, and

whether they allege excessive force or some other wrong."  *Id.* at 532.


        In New York State, DOCS employs a three-step IGP that requires an

inmate to: (1) file a grievance with the IGRC as set forth in 7 N.Y.C.R.R. § 701.7(a)(1);

(2) appeal to the superintendent within four working days of receiving the IGRC's

adverse written response as set forth in 7 N.Y.C.R.R. § 701.7(b)(1); and appeal to the

CORC in Albany, New York within four working days of receipt of the superintendent's

adverse written response, as set forth in 7 N.Y.C.R.R. § 701.7(c)(1).  *Abney v. New*

*York Dep't of Corr. Servs.*, 380 F.3d 663  (2d Cir. 2004).


        In assessing what constitutes exhaustion of administrative remedies, the

Court of Appeals for the Second Circuit has determined that

> a three-part inquiry is appropriate in cases where a prisoner
> plaintiff plausibly seeks to counter defendants' contention
> that the prisoner has failed to exhaust available
> administrative remedies as required by the PLRA, 42 U.S.C.

> § 1997e(a).  Depending on the inmate's explanation for the
> alleged failure to exhaust, the court must ask whether
> administrative remedies were in fact "available" to the
> prisoner.  The Court should also inquire as to whether the
> defendants have forfeited the affirmative defense of non-
> exhaustion by failing to raise or preserve it, or whether the
> defendants' own actions inhibiting the inmate's exhaustion of
> remedies may estop one or more of the defendants from
> raising the plaintiff's failure to exhaust as a defense. If the
> court finds that administrative remedies were available to the
> plaintiff, and that the defendants are not estopped and have
> not forfeited their non-exhaustion defense, but that plaintiff
> nevertheless did not exhaust administrative remedies, the
> court should consider whether "special circumstances" have
> been plausibly alleged that justify "the prisoner's failure to
> comply with administrative procedural requirements."

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004) (internal citations omitted).


In the instant case, defendants have not demonstrated their entitlement to summary judgment on the issue of exhaustion of administrative remedies.  Plaintiff asserts that he filed a grievance with respect to the denial of recreation and submits numerous letters complaining about the lack of response to this grievance, as well as an additional grievance complaining about the lack of response to the original grievance.  Dkt. #28, ¶¶ 30-31; Dkt. #55, Exh. I, J & L -Q.  Ultimately, grievance #A-40480-00 was "accepted," with a notation that plaintiff was "entitled to daily keeplock rec." but that he was no longer affected by this issue as he was no longer in keeplock.  Dkt. #55, Exh. R.  Plaintiff submitted a letter entitled "grievance appeal" questioning the failure to address the remaining issues set forth in his grievance. Dkt. #55, Exh. S.  Plaintiff also submitted letters complaining that he had received no response to his appeal.  Dkt. #55, Exh. T-U & Y.  Given the voluminous correspondence regarding

plaintiff's attempts to grieve these issues, and the ultimate determination that plaintiff

was entitled to daily keeplock recreation as he had requested, there is a question of

material fact with respect to the issue of exhaustion, specifically, the availability of the

grievance process to plaintiff, necessitating denial of C.O. Smalok's and C.O. Magyar's

motions for summary judgment on this ground.  *See Abney,* 380 F.3d 663; *Liner v.*

*Goord*, 310 F. Supp.2d 550, 553-54 (W.D.N.Y. 2004).


## Deprivation of Due Process

To state a cognizable § 1983 due process claim, a plaintiff must

demonstrate that he possessed a protected liberty or property interest and that he was

deprived of that interest without due process.  *Bedoya v. Coughlin*, 91 F.3d 349, 351-52

(2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996).


Lt. Breckon argues that plaintiff was afforded all of the due process to

which he was entitled with respect to the Tier III disciplinary hearing.  Dkt. #47, pp.9-22.


Timeliness of Misbehavior Report

Plaintiff complains that it took 19 days from the time the William Lynch

Lecture was confiscated until he was served with the misbehavior report.  Dkt. #28,

¶ 17.  As plaintiff was not subject to disciplinary confinement until he was served with

the misbehavior report, the Court finds no constitutional concern with the passing of this

amount of time from the discovery of the unauthorized materials to the issuance of the

misbehavior report.

<u>Deprivation of Documents & Witnesses</u>

Plaintiff complains that he was denied (1) documentary evidence, including an investigative report; a copy of the policy governing incoming property, and a copy of Directive #4004 governing the process for disciplinary hearings; (2) documents, including the misbehavior report, from the disciplinary hearing involving the document indicating that AFC was the acronym for Amfrican Freedom Communion; (3) the name of the inmate at Attica who allegedly formed the Amfrican Freedom Communion; (4) the opportunity to call as a witness the teacher at Greenhaven to explain that the speech was part of the class curriculum and how it was obtained; and (5) notice of the fact that the Amfrican Freedom Communion was not an authorized group.  Dkt. #28, ¶ ¶ 11, 14, 15 & 16.

In *Wolff v. McDonnell*, the Supreme Court of the United States determined that an

> inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

418 U.S. 539, 566 (1974).  In reaching this conclusion, the Court recognized that

> Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.*  In exercising that discretion, prison officials must be able to

> explain, in a limited manner, the reason why witnesses were
> not allowed to testify, . . . either by making the explanation a
> part of the "administrative record" in the disciplinary
> proceeding, or by presenting testimony in court if the
> deprivation of a "liberty" interest is challenged because of
> that claimed defect in the hearing.  In other words, the prison
> officials may choose to explain their decision at the hearing,
> or they may choose to explain it "later."

*Ponte v. Real*, 471 U.S. 491, 497 (1985).  A hearing officer may rationally exclude

witnesses or documents when they would be irrelevant or unnecessary to a

determination of the issues in the disciplinary hearing.  *Kalwasinski*, 201 F.3d 103, 109

(2d Cir. 1999).  The burden is on the prison official to demonstrate "the rationality of his

position."  *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).


　　　　While it is clear that this misbehavior report was one of many with respect

to the Amfrican Freedom Communion and a rumored inmate strike/uprising planned for

January 1, 2000, plaintiff was not entitled to information regarding this larger

investigation in the context of his disciplinary hearing.  Thus, plaintiff's request for an

investigative report was satisfied with Lt. Breckon's representation that the misbehavior

report, which plaintiff possessed, was the only written document relevant to his

disciplinary hearing.  Dkt. #49, Exh. B, p.2.


　　　　Plaintiff was afforded the opportunity to review the document confiscated

from another inmate which indicated that the William Lynch Lecture was produced  by

"The AmFrican Freedom Communion (AFC)," as Lt. Breckon utilized that document to

counter plaintiff's argument that AFC could be the acronym for any number of

organizations.  Dkt. #49, Exh. A, pp.9, 12 & 14-17.  Because the document was utilized for this limited purpose, the denial of the misbehavior report accompanying that document was not improper.

Although C.O. Foley explained that the AFC was formed by an inmate at Attica, the identity of the inmate is irrelevant to the determination of whether the organization was authorized by DOCS.  Dkt. #49, Exh. B, p.21.  As Lt. Breckon explained, there is no list of unauthorized organizations, as the policy sets forth authorized organizations and prohibits any organization which is not on the list of authorized organizations.  Dkt. #49, Exh. B, p.11.  Plaintiff did not assert that he was unaware of the rule, so he cannot complain that he lacked notice of the process by which DOCS determined whether an organization was unauthorized.

Finally, the transcript indicates that plaintiff was provided with a copy of the policy on transferring inmate property from one facility to another and the directive governing hearing procedures.  Dkt. #49, Exh. B, pp.3 & 4.  With respect to his request for the annotated version of the directive governing hearing procedures, plaintiff was told he could request that from the law library.  Dkt. #49, Exh. B, p.4.  Thus, plaintiff was not denied documentary evidence.

Similarly, the denial of plaintiff's request for testimony from his teacher at Greenhaven was not improper because there was no question as to the permissibility of the content of the William Lynch Lectures; the only question was about the propriety of

the source of that information.  Plaintiff did not argue that the copy of the William Lynch

Lectures at issue was obtained from that teacher; he stated that he obtained his copy of

the William Lynch Lectures through the mail while he was housed at Greenhaven. Dkt.

#49, Exh. B, p.11-12.  Thus, the denial of this witness was not improper.


Impartiality of Hearing Officer

Plaintiff argues that Lt. Breckon demonstrated bias when he informed

plaintiff that C.O. Foley was right when he relied upon a copy of the William Lynch

Lecture that had been confiscated from another inmate.  Dkt. #28, ¶¶ 18-19.


"An inmate subject to a disciplinary hearing is entitled to an impartial

hearing officer."  *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *see Wolff*, 418 U.S.

at 570-71; *Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir.1994).  An impartial hearing officer

"is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he

would assess evidence he has not yet seen."  *Patterson v. Coughlin*, 905 F.2d 564,

569-70 (2d Cir.1990); *see Francis* v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) ("it would

be improper for prison officials to decide the disposition of a case before it was heard").


It is well recognized, however, "that prison disciplinary hearing officers

are not held to the same standard of neutrality as adjudicators in other contexts."  *Allen*,

100 F.3d at 259; *see Francis*, 891 F.2d at 46 ("Because of the special characteristics of

the prison environment, it is permissible for the impartiality of such officials to be

encumbered by various conflicts of interest that, in other contexts, would be adjudged

of sufficient magnitude to violate due process.").  For example, "[t]he degree of

impartiality required of prison officials does not rise to the level of that required of

judges generally."  *Allen,* 100 F.3d at 259; *see Francis*, 891 F.2d at 46.


During a discussion about how Lt. Breackon could conclude that AFC was

an unauthorized organization, Lt. Breckon stated:

> And while . . . it does not say Amfrican Freedom
> Communion on that document, since this is paperwork that
> is commonly found associated with that group, and since it
> has those initials on it, I believe Officer Foley is correct in
> stating that it is associated with that group.

Dkt. #49, Exh. B, p.10.  Lt. Breckon was not partial because he agreed with C.O.

Foley's determination that the initials AFC stood for Amfrican Freedom Communion.

That deduction was rational given that similar content had been confiscated with

express indication that it had been produced by "The AmFrican Freedom Communion

(AFC)."  Dkt. #49, Exh. A, p.12.


As plaintiff received all of the process he was due in the course of his

disciplinary hearing, Lt. Breckon's motion for summary judgment is granted.


### Sanctions

Plaintiff moves pursuant to Fed. R. Civ. P. 37 for sanctions based upon

the Assistant Attorney General's ("AAG's"), representation that materials sought in

discovery, which the Court directed be produced following plaintiff's motion to compel,

did not exist.  Dkt. #59.  Specifically, plaintiff sought

> inmate Charles Hamilton #83-B-0039, Misbehavior report
> along with the appeal packet along with his reversal decision
> be [sic] central officer [sic] concerning the same charge that
> I was charged with.  Inmate Charles Hamilto[n] #83-B-0039
> was transferred to Attica in December and received this
> misbehavior report during that same time, I would like all the
> information concerning the report.

Dkt. #59, Exh. B, No.3.

The AAG initially objected to this discovery demand as "neither relevant

nor reasonably calculated to lead to the discovery of admissible evidence." Dkt. #59,

Exh. C.  Plaintiff moved to compel this information.  Dkt. #59, Exh. E.  Defendants

opposed the motion to compel on the ground that Mr. Hamilton's information "was

neither relevant nor reasonably calculated to lead to the discovery of admissible

evidence."  Dkt. #34, ¶ 24.  Following a teleconference conducted on January 14, 2003,

the Court stayed the Case Management Order to permit the AAG to respond to this

discovery demand.  Dkt. #40.

On March 21, 2003, the AAG submitted a declaration from Donald Selsky,

Director of Special Housing and Inmate Discipline, stating as follows:

> 4.   As the Commissioner's designee, I am responsible
> for overseeing the operation of the Special Housing
> Units ("SHU") at the various prison facilities and
> responding to inmate appeals of Tier III hearings and
> general monitoring of the inmate disciplinary system.

> 5.  I have caused a search of the inmate disciplinary files
> maintained by this office.

6. There is no record of any appeal filed with the Inmate Disciplinary Program by inmate Charles Hamilton, 83-B-0039, regarding any Tier III hearing held on or about December 1999.

7. Even if Mr. Hamilton's record had been expunged, there would be a record of an appeal filed with the Inmate Disciplinary Program by Mr. Hamilton.

Dkt. #41.

Following receipt of this Declaration, plaintiff wrote the New York State Supreme Court, Appellate Division, Fourth Department, and requested a copy of the Memorandum regarding *Matter of Hamilton v. Goord*, Docket No. TP 00-01897. Dkt. #59, Exh. G. In response, the Appellate Division provided plaintiff with a copy of a Memorandum from James Conway, First Deputy Superintendent at Attica, notifying Mr. Hamilton that the

Tier II Hearing completed on 12/23/99 by Lt. Pastwik for a report written on 12/21/99 by C.O. P. Foley is hereby Administratively reversed. The hearing will be expunged from your file and you will be reimbursed the $5.00 disciplinary surcharge.

Dkt. #59, Exh. H. As a result of this resolution, Mr. Hamilton's appeal of his Article 78 proceeding challenging the disciplinary proceeding was dismissed as moot. Dkt. #59, Exh. H.

On January 2, 2004, plaintiff obtained, via a Freedom of Information Request, the Article 78 Order to Show Cause and Petition filed by Mr. Hamilton; the Answer to the Petition; the Transfer Order to the Appellate Division; and a copy of the

Brief filed in support of the petition.  Dkt. #59, Exh. I & J.  Coincidentally, the same AAG representing defendants in this action filed the Answer requesting that Mr. Hamilton's Article 78 proceeding be transferred to the Appellate Division.  Dkt. #59, Exh. I.

Plaintiff complains that the AAG and Director Selsky mislead the Court and seeks sanctions in the form of: costs; striking Lt. Breckon's Answer and awarding judgment in plaintiff's favor.  Dkt. #59.

The AAG responds that she made a good faith effort to obtain the documents at issue by requesting them from the person she believed would have been in possession of the requested documents, *to wit*, Donald Selsky.  Dkt. #62.  The AAG declares that she has no recollection of the Article 78 petition commenced by Mr. Hamilton, noting that her only involvement in the matter was to review and sign the Answer and appear before Hon. Mark H. Dadd, J.S.C., to request the matter be transferred to the Appellate Division.  Dkt. #62.

Fed. R. Civ. P. 37(b)(2)(A) provides that if a party fails to obey an order to provide or permit discovery, the Court "may issue further just orders," including:

> (i)  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii)  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

  (iii) striking pleadings in whole or part;

  (iv) staying further proceedings until the order is obeyed;

  (v) dismissing the action or proceeding in whole or part;

  (vi) rendering a default judgment against the
    disobedient party; or

  (vii) treating as contempt of court the failure to obey
    any order except an order to submit to a physical
    or mental examination.

Moreover, Fed. R. Civ. P. 37(b)(2)(C) provides that

> Instead of or in addition to the orders above, the court must
> order the disobedient party, the attorney advising the party,
> or both to pay the reasonable expenses, including attorney's
> fees, caused by the failure, unless the failure was
> substantially justified or other circumstances make an award
> of expenses unjust.

   In the instant case, defendants' inability to produce the Hamilton materials stems from the fact that defendants presumed that Mr. Hamilton was subject to a Tier III misbehavior report, which would have been appealed to Donald Selsky in his position as Director of Special Housing/Inmate Disciplinary Program, while Mr. Hamilton was actually subject to a Tier II hearing, which are appealed to the facility Superintendent, in this case, James Conway.  *See* 7 N.Y.C.R.R. §§  253.8 & 254.8.  Such an assumption does not warrant sanctions.  It does, however, warrant compensation to plaintiff for his efforts in obtaining these documents through other sources.  Accordingly, the Court directs that, pursuant to Fed. R. Civ. P. 37(b)(2)(C), defendants pay plaintiff $50 as an approximation of his reasonable expenses for postage and photocopying expenses relating to his F.O.I.L. request and letters to the Appellate Division.

**CONCLUSION**

For the foregoing reasons, Lt. Breckon's motion (Dkt. #46), for summary judgment is granted; C.O. Smalok's motion  (Dkt. #46),  for summary judgment is denied; C.O. Magyar's motion  (Dkt. #46), for summary judgment is denied; and plaintiff's motion (Dkt. #59), for sanctions is granted in part and denied in part, such that defendants are ordered to pay plaintiff $50 for expenses.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

DATED:      Buffalo, New York
            July 15, 2008

*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**